## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| SEAN SHEFFLER, individually and on behalf of all others similiarly situated,<br><br>Plaintiff,<br><br>    v.<br><br>ACTIVATE HEALTHCARE, LLC,<br><br>Defendant. | Case No. 1:23-cv-1206-SEB-TAB<br><br>Judge: Hon. Sarah Evans Barker<br>Magistrate: Hon. Tim A. Baker<br><br><br>**JURY TRIAL DEMANED** |

## SECOND[1] AMENDED CLASS ACTION COMPLAINT

Plaintiff Sean Sheffler ("Plaintiff"), through his undersigned counsel, brings this action against Activate Healthcare, LLC. ("Activate" or "Defendant") pursuant to the investigation of his attorney, personal knowledge as to himself and his own acts and otherwise upon information and belief, and alleges as follows:

## INTRODUCTION

1.      Activate is a healthcare organization that appears to work exclusively or nearly exclusively through employers, providing employer-related services, such as physicals and drug screening for potential employees.

2.      On or about June 23, 2023, Activate announced publicly that between April 22 and April 28, 2023, it had been the recipient of a hack and exfiltration of sensitive personal information

---

[1] Plaintiff filed an Amended Class Action Complaint on August 1, 2023 pursuant to court order to clarify jurisdictional allegations.  *See* ECF Nos. 8, 10.  Plaintiff now files this second amended complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B).

("SPI") involving approximately 93,761 individuals who are and have been patients, sent to Activate by its client companies (the "Data Breach").

3.    Activate reported that this SPI "may have included" at least "patient names, dates of birth, address, Social Security number, driver's license number, and clinical information, such as provider name, date of service, and/or diagnosis."[2]

4.    Plaintiff and Class members now face a present and imminent lifetime risk of identity theft, which is heightened here by the potential loss of Social Security numbers.

5.    The information stolen in cyber-attacks allows the modern thief to assume victims' identities when carrying out criminal acts such as:

- Filing fraudulent tax returns;
- Using your credit history;
- Making financial transactions on behalf of victims, including opening credit accounts in victims' names;
- Impersonating victims via mail and/or email;
- Impersonating victims in cyber forums and social networks;
- Stealing benefits that belong to victims; and
- Committing illegal acts which, in turn, incriminate victims.

6.    Plaintiff's and Class members' SPI was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the SPI of Plaintiff and Class members.

7.    As of this writing, there exist many class members who have no idea their SPI has been compromised, and that they are at significant risk of identity theft and various other forms of personal, social, and financial harm.  The risk will remain for their respective lifetimes.

8.    Plaintiff brings this action on behalf of all persons whose SPI was compromised as

---

[2]http://www.activatehealthcare.com/notice.html, last accessed July 7, 2023.

a result of Defendant's failure to: (i) adequately protect consumers' SPI, (ii) adequately warn its current and former customers and potential customers of its inadequate information security practices, and (iii) effectively monitor its platforms for security vulnerabilities and incidents (the "Class"). Defendant's conduct amounts to negligence and violates state statutes.

9.    Plaintiff and similarly situated individuals have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished inherent value of SPI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and (v) the continued and certainly an increased risk to their SPI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

11.    This Court has personal jurisdiction over Defendant because Defendant's principal places of business are located within this District.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Defendant resides within this judicial district and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## PARTIES

13.    Plaintiff Sean Sheffler is a citizen of Ohio residing in Defiance County.  On or about June 26, 2023, Plaintiff Goldberg was informed by letter that he had been a victim of the Data Breach.

14.    Defendant Activate Healthcare, LLC. is a for-profit Indiana limited liability company with its principal place of business at 1400 Wewatta Street, Suite 350, Denver, Colorado 80202.

15.    Activate is a wholly-owned subsidiary of Paladina DPC Holding Co., LLC ("Paladina"), a Delaware limited liability corporation with its principal place of business at 1400 Wewatta Street, Suite 350, Denver, Colorado 80202.

16.    Paladina is a wholly-owned subsidiary of Everside Health Group, Inc., a Delaware corporation with its principal place of business at 1400 Wewatta Street, Suite 350, Denver, Colorado 80202.

17.    Everside Health Group, Inc. is a wholly-owned subsidiary of Everside Health Holdings, LLC, a Delaware corporation with its principal place of business at 1400 Wewatta Street, Suite 350, Denver, Colorado 80202.

## FACTUAL ALLEGATIONS

18.    Defendant is a healthcare company that advertises and sells its services to employers, who use it for various services, not least of which are employee drug screens.

19.    Defendant does not readily list its available services on the web, merely stating that it offers "tailored solutions to activate organizations and patients"[3] – whatever that means.

---

[3] http://www.activatehealthcare.com/, last accessed July 7, 2023.

20.     It is unclear from Defendant's website or any other sources how many employers or corporations use Defendant's services.

21.     In the ordinary course of doing business with Defendant, patients (and possibly employer clients) provide Defendant with patient SPI such as:

a.  Contact and account information, such as name, usernames, passwords, address, telephone number, email address, and household members;

b.  Authentication and security information such as government identification, Social Security number, security codes, and signature;

c.  Demographic information, such as age, gender, and date of birth;

d.  Payment information, such as credit card, debit card, and/or bank account number; and

e.  Medical history as self-reported by customers, or medical history as transmitted from other healthcare providers;

22.     On or about June 23, 2023, Defendant began sending out letters to patients of its customers stating that "an unauthorized party accessed our network and, between April 22, 2023 and April 28, 2023, copied some of the documents from the system."[4]  Activate further stated that it was able to determine that patient information had been stolen.[5]

23.     Activate stated that the SPI involved included "patient names, dates of birth, address, Social Security number, driver's license number, and clinical information, such as provider name, date of service, and/or diagnosis."[6]

---

[4] http://www.activatehealthcare.com/notice.html, last accessed July 7, 2023.
[5] *Id.*
[6] *Id.*

24.     Of concern, while Defendant became aware of the Data Breach no later than April 27, 2023, it took approximately two months for Defendant to notify patients and customer clients as well as to publicly reveal the breach.

25.     As a result, Plaintiff's and class members' SPI was in the hands of hackers for more and available on the dark web for at least two months before Defendant began notifying them of the Data Breach.

26.     Defendant has been extremely vague on its response to the Data Breach, stating that "Activate Healthcare remains committed to protecting the confidentiality and security of patient information. We will continue to take steps to enhance the security of our computer systems and the data we maintain."[7]  This statement implies that little, if anything, has been done in the wake of the Data Breach to strengthen its systems.

27.     Further, Defendant claims on its website to be offering "complimentary credit monitoring and identity protection services"[8], but offers no details as to whose services will be offered or for how long.  Conspicuously, this language is absent from the notice letter sent to patients.

28.     This response is entirely inadequate to Plaintiff and class members who now potentially face several years of heightened risk from the theft of their SPI and who may have already incurred substantial out-of-pocket costs in responding to the Data Breach.

29.     Activate, in its Privacy Policy, states "Our Site uses appropriate data collection, storage and processing practices, and security measures designed to protect against unauthorized

---

[7] *Id.*

[8] *Id.*

access, alteration, disclosure, or destruction of your personal information, username, password, transaction information, and data stored on our Site. Any sensitive and private data exchanged between the Site and its Users is done using an SSL-secured communication channel, encrypted and protected using public key encryption and digital signatures."[9]

30.    Activate, notably, also does not appear to have any sort of a HIPAA privacy policy on its site, in spite of the fact that it routinely handles Protected Health Information.

31.    Plaintiff and members of the Class did not so consent to having their SPI disclosed as part of the Data Breach.

32.    Defendant had obligations created by contract, industry standards, common law, and public representations made to Plaintiff and Class members, to keep their SPI confidential and to protect it from unauthorized access and disclosure.

33.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches in the healthcare industry preceding the date of the breach.

34.    Indeed, data breaches, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry, including Defendant.

35.    According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to

---

[9] http://www.activatehealthcare.com/privacy-policy.html, last accessed July 7, 2023.

resolve.[10]  Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[11]

36.     The SPI of Plaintiff and members of the Class was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the SPI for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

37.     Defendant knew, or reasonably should have known, of the importance of safeguarding the SPI of Plaintiff and members of the Class, including Social Security numbers, dates of birth, and other sensitive information, as well as of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and members of the Class a result of a breach.

38.     Plaintiff and members of the Class now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their SPI.

39.     The injuries to Plaintiff and members of the Class were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the SPI of Plaintiff and members of the Class.

40.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need

---

[10] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf, last accessed March 10, 2023.

[11] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

for data security should be factored into all business decision-making.

41.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

42.    The FTC further recommends that companies not maintain SPI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

43.    The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

44.    Defendant failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer SPI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

45.    A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendant's cybersecurity practices.

46.     Best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

47.     Upon information and belief, Defendant failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

48.     These foregoing frameworks are existing and applicable industry standards in Defendant's industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber-attack and causing the Data Breach.

49.     Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identity theft and other types of fraud.

50.     The SPI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[12]

51.     Social Security numbers, for example, are among the worst kind of personal

---

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs, last accessed July 7, 2023.

information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[13]

52.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

53.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[14]

54.     Furthermore, as the SSA warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies)  likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal

---

[13] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), https://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed July 7, 2023.

[14] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft, last accessed July 7, 2023.

information, such as your name and address,  remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[15]

55.     Here, the unauthorized access left the cyber criminals with the tools to perform the most thorough identity theft—they have obtained all the essential SPI to mimic the identity of the user.  The personal data of Plaintiff and members of the Class stolen in the Data Breach constitutes a dream for hackers and a nightmare for Plaintiff and the Class.  Stolen personal data of Plaintiff and members of the Classes represents essentially one-stop shopping for identity thieves.

56.     The FTC has released its updated publication on protecting SPI for businesses, which includes instructions on protecting SPI, properly disposing of SPI, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

57.     General  policy  reasons  support  such  an  approach.   A  person  whose  personal information has been compromised may not see any signs of identity theft for years.  According to  the  United  States  Government  Accountability  Office  ("GAO")  Report  to  Congressional Requesters:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[16]

58.     Companies  recognize  that  SPI  is  a  valuable  asset.  Indeed,  SPI  is  a  valuable commodity.  A "cyber black-market" exists in which criminals openly post stolen Social Security

---

[15] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed July 7, 2023.

[16] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29, last accessed July 7, 2023.

numbers and other SPI on a number of Internet websites. The stolen personal data of Plaintiff and members of the Class has a high value on both legitimate and black markets.

59.     Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

60.     As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns.  Defendant's former and current customers whose Social Security numbers have been compromised now face a real, present, imminent and substantial risk of identity theft and other problems associated with the disclosure of their Social Security number and will need to monitor their credit and tax filings for an indefinite duration.

61.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change — Social Security number, driver license number or government-issued identification number, name, and date of birth.

62.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[17]

63.     This is even more true for minors, whose Social Security Numbers are particularly

---

[17] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html, last accessed July 7, 2023.

valuable. As one site noted, "The organization added that there is extreme credit value in Social Security numbers that have never been used for financial purposes. It's relatively simple to add a false name, age or address to a Social Security number. After that happens, there is a window for thieves to open illicit credit cards or even sign up for government benefits."[18]

64.    Among other forms of fraud, identity thieves may obtain driver licenses, government benefits, medical services, and housing or even give false information to police. An individual may not know that his or her driver license was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

## FACTS SPECIFIC TO PLAINTIFF

65.    On or about June 26, 2023, Plaintiff was notified via letter from Defendant dated June 23, 2023 that Plaintiff's SPI had been taken as part of the Data Breach. A copy of the first page of the letter is attached hereto as Exhibit A.

66.    Plaintiff has been a patient of Defendant's at the past, when required to visit Defendant for onboarding procedures from his employer.

67.    Since the time of the Data Breach, Plaintiff has received numerous calls from various scammers attempting to get him to sign up for medical benefits and other scams. This activity indicates that his information has been placed into the hands of hackers and has already been sold throughout the dark web.

68.    The Data Breach has caused Plaintiff to spend approximately 40 hours attempting to address and remediate the effects of the hack and exfiltration, as well as anxiety and distress.

---

[18] https://www.identityguard.com/news/kids-targeted-identity-theft, last accessed July 11, 2022.

69.    Plaintiff is aware of no other source from which the theft of his medical SPI could have come.  He regularly takes steps to safeguard his own SPI in his own control.

## CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this nationwide class action pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class:

> All natural persons residing in the United States whose SPI was compromised in the Data Breach announced by Defendant on or about June 23, 2023 (the "Nationwide Class" or the "Class").

71.    Excluded from the Class are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members.

72.    Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

73.    **Numerosity**: The Classes are so numerous that joinder of all members is impracticable. Defendant has, as of this writing, indicated to the U.S. Department of Health and Human Services that the total number of Class Members is approximately 93,761.[19] The Class is readily identifiable within Defendant's records.

74.    **Commonality**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual members of the Class. These include:

a.    When Defendant actually learned of the Data Breach and whether its response was adequate;

b.    Whether Defendant owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their SPI;

c.    Whether Defendant breached that duty;

---

[19] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, last accessed July 7, 2023.

d.     Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing the SPI of Plaintiff and members of the Class;

e.     Whether Defendant acted negligently in connection with the monitoring and/or protection of SPI belonging to Plaintiff and members of the Class;

f.     Whether Defendant knew or should have known that it did not employ reasonable measures to keep the SPI of Plaintiff and members of the Class secure and to prevent loss or misuse of that SPI;

g.     Whether Defendant has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.     Whether Defendant caused Plaintiff's and members of the Class damage;

i.     Whether Defendant violated the law by failing to promptly notify Plaintiff and members of the Class that their SPI had been compromised; and

j.     Whether Plaintiff and the other members of the Class are entitled to credit monitoring and other monetary relief.

75.     **Typicality**: Plaintiff's claims are typical of those of the other members of the Class because all had their SPI compromised as a result of the Data Breach due to Defendant's misfeasance.

76.     **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's counsel are competent and experienced in litigating privacy-related class actions.

77.     **Superiority and Manageability**:  Under rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual member of the Class are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted

-16-

claims.  There will be no difficulty in the management of this action as a class action.

78.     Class certification is also appropriate under Rule 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

79.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.     Whether Defendant owed a legal duty to Plaintiff and members of the Class to exercise due care in collecting, storing, using, and safeguarding their SPI;

b.     Whether Defendant breached a legal duty to Plaintiff and the members of the Class to exercise due care in collecting, storing, using, and safeguarding their SPI;

c.     Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e.     Whether members of the Class are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## FIRST CLAIM FOR RELIEF
### Negligence
**(By Plaintiff Individually and on Behalf of the Nationwide Class)**

80.     Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 79.

81.     Defendant routinely handles SPI that is required of their patients, such as Plaintiff.

82.     By collecting and storing the SPI of its customers, Defendant owed a duty of care to the individuals whose SPI it collected to use reasonable means to secure and safeguard that SPI.

83.    As a medical services provider, Defendant is aware of that duty of care to the SPI of its customers.

84.    Additionally, as a covered entity, Defendant has a duty under HIPAA privacy laws to protect the confidentiality of patient healthcare information, including the kind stolen as part of the Data Breach.

85.    Defendant has full knowledge of the sensitivity of the SPI and the types of harm that Plaintiff and Class Members could and would suffer if the SPI were wrongfully disclosed.

86.    Defendant knew or reasonably should have known that its failure to exercise due care in the collecting, storing, and using of their customers' SPI involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred through the criminal acts of a third party.

87.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiff's and Class Members' information in Defendant's possession was adequately secured and protected.

88.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and Class Members' SPI.

89.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class Members was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

90.    Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of should have known of the

inherent risks in collecting and storing the SPI of Plaintiff and the Class, the critical importance of providing adequate security of that SPI, and the necessity for encrypting SPI stored on Defendant's systems.

91.    Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiff's and Class Members' SPI, including basic encryption techniques freely available to Defendant.

92.    Plaintiff and the Class Members had no ability to protect their SPI that was in, and possibly remains in, Defendant's possession.

93.    Defendant was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

94.    Defendant had and continues to have a duty to adequately disclose that the SPI of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their SPI by third parties.

95.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the SPI of Plaintiff and Class Members.

96.    Defendant has admitted that the SPI of Plaintiff and Class Members was purposely exfiltrated and disclosed to unauthorized third persons as a result of the Data Breach.

97.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to implement industry protocols and exercise reasonable

care in protecting and safeguarding the SPI of Plaintiff and Class Members during the time the SPI was within Defendant's possession or control.

98.     Defendant improperly and inadequately safeguarded the SPI of Plaintiff and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

99.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the SPI it had in its possession in the face of increased risk of theft.

100.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former employees' SPI.

101.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

102.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class Members, the SPI of Plaintiff and Class Members would not have been compromised.

103.    There is a close causal connection between Defendant's failure to implement security measures to protect the SPI of Plaintiff and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiff and the Class.  Plaintiff's and Class Members' SPI was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such SPI by adopting, implementing, and maintaining appropriate security measures.

104.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their SPI is used; (iii) the compromise, publication, and/or

theft of their SPI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their SPI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI of its employees and former employees in its possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the SPI compromised as a result of the Data Breach for the remainder of Plaintiff's and Class Members' lives.

105.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their SPI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI in its continued possession.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Breach of Implied Contract**
**(By Plaintiff Individually and on Behalf of the Class)**

106.    Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 79.

107.    When Plaintiff and Class Members provided their SPI to Defendant in exchange for healthcare services provided by Defendant, they entered into implied contracts with Defendant

under which—and by mutual assent of the parties—Defendant agreed to take reasonable steps to protect their SPI.

108.    Defendant solicited and invited Plaintiff and Class Members to provide their SPI as part of Defendant's regular business practices and as essential to the services transactions entered into between Defendant on the one hand and Plaintiff and Class Members on the other.  This conduct thus created implied contracts between Plaintiff and Class Members on the one hand, and Defendant on the other hand.  Plaintiff and Class Members accepted Defendant's offers by providing their SPI to Defendant in connection with their purchases from Defendant.

109.    When entering into these implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws, regulations, and industry standards.

110.    Defendant's implied promise to safeguard Plaintiff's and Class Members' SPI is evidenced by a duty to protect and safeguard SPI that Defendant required Plaintiff and Class Members to provide as a condition of entering into a prospective or actual employment relationship with Defendant.

111.    Plaintiff and Class Members, on the one hand, and Defendant, on the other hand, mutually intended that Defendant would adequately safeguard SPI.  Defendant failed to honor the parties' understanding of these contracts, causing injury to Plaintiff and Class Members.

112.    Plaintiff and Class Members value data security and would not have provided their SPI to Defendant in the absence of Defendant's implied promise to keep the SPI reasonably secure.

113.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

114.    Defendant breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable data security measures and permitting the Data Breach to occur.

115.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

116.    Plaintiff and Class Members are entitled to compensatory, consequential, and other damages suffered as a result of the Data Breach.

117.    Plaintiff and Class Members also are entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide credit monitoring and identity theft insurance to Plaintiff and Class members.

### THIRD CLAIM FOR RELIEF
**Breach of Third-Party Beneficiary Contract,**
**(In the Alternative, By Plaintiff Individually and on Behalf of the Class)**

118.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 79.

119.    Upon information and belief, Defendant entered into contracts with its corporate customers to provide services to them; services that included data security practices, procedures, and protocols sufficient to safeguard the SPI that was entrusted to it.

120.    Upon information and belief, Defendant entered into contracts with its corporate customers to provide healthcare and testing services; services that included data security practices, procedures, and protocols sufficient to safeguard the SPI that was entrusted to it.

121.    Such contracts were made expressly for the benefit of Plaintiff and the Class, as it was their SPI that Defendant agreed to receive, store, utilize, transfer, and protect through its services. Thus, the benefit of collection and protection of the SPI belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

122.    Defendant knew or should have known that if it were to breach these contracts with its customers, Plaintiff and Class Members would be harmed.

123.    Defendant breached their contracts with corporate customers by, among other things, failing to adequately secure Plaintiff and Class Members' SPI, and, as a result, Plaintiff and Class Members were harmed by Defendants' failure to secure their SPI.

124.    As a direct and proximate result of Defendants' breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained incidental and consequential damages including: (i) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out of pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) diminution of value of their SPI; (vii) future costs of identity theft monitoring; (viii) and the continued risk to their SPI, which remains in Defendants' control, and which is subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' SPI.

125.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

126.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### FOURTH CLAIM FOR RELIEF
**Bailment**
**By Plaintiff Individually and on Behalf of the Class)**

127.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 79.

128.    Plaintiff and the Class delivered their personal and health information to Defendant for the exclusive purpose of obtaining services or employment.

129.    The SPI is intangible personal property belonging to Plaintiff and the Class Members that has internal value, both to themselves and to third-parties, such as hackers.

130.    In delivering their personal data to Defendant, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard their personal data, including that Defendant would maintain the confidentiality of that information.

131.    Defendant understood that it had a duty to account for and safeguard the SPI entrusted to it, as well as to return it upon request.

132.    Defendant accepted possession of Plaintiff's and Class Members' SPI for the purpose of providing healthcare services to Plaintiff and Class Members during the ordinary course of business.

133.    Defendant was in full control and exclusive possession of Plaintiff's and Class Members' SPI once it was placed on Defendant's servers.

134.    A bailment (or deposit) was established for the mutual benefit of the parties.

135.    During the bailment (or deposit), Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care, diligence, and prudence in protecting their personal data as well as a duty to safeguard personal information properly and maintain reasonable security procedures and practices to protect such information.

136.    Defendant breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class Members' personal and health information, resulting in the unlawful and unauthorized access to and misuse of Plaintiff's and Class Members' personal, health, and financial information.

137.    As a proximate result of this conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment, in the Alternative**
**(By Plaintiff Individually and on Behalf of the Class)**

138.    Plaintiff hereby re-alleges and incorporates by reference all of the allegations in paragraphs 1 to 79.

139.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of storing their SPI with Defendant in such a way that saved expense and labor for Defendant.

140.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Defendant also benefited from the receipt of Plaintiff's and Class Members' SPI, as this was used by Defendant to facilitate its core functions.

141.    The benefits given by Plaintiff and Class Members to Defendant were to be used by Defendant, in part, to pay for or recoup the administrative costs of reasonable data privacy and security practices and procedures.

142.    As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial.

143.    Under principles of equity and good conscience, Defendant should not be permitted to retain a benefit belonging to Plaintiff and Class Members because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and Class Members granted to Defendant or were otherwise mandated by federal, state, and local laws and industry standards.

144.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds or benefits it received as a result of the conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all Class Members, requests judgment against the Defendant and the following:

A.    For an Order certifying the Class as defined herein, and appointing Plaintiff and their counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and the Class Members' SPI;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiff and Class Members' personal identifying information;

iv.    prohibiting Defendant from maintaining Plaintiff's and Class Members' personal identifying information on a cloud-based database (if, in fact, it does so);

-27-

  v. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

  vi. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

  vii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

  viii. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

  ix. requiring Defendant to conduct regular database scanning and securing checks;

  x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

  xi. requiring Defendant to routinely and continually conduct internal training

and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class,

and to report any deficiencies with compliance of the Court's final judgment; and

D.    For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For pre- and postjudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: October 12, 2023                    Respectfully Submitted,

By: /s/ *Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

*Attorney for Plaintiff and*
*the Putative Class*